# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

  -vs-                                                                   CRIMINAL No. 11-2868 LH

MARIA FRIDA VALDEZ-PEREA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress and Memorandum in Support (Doc. 21). The Court held a hearing on the motion on May 1, 2012. The Court, having considered the motion, briefs, evidence, argument, and otherwise being fully advised, concludes that the motion to suppress should be denied.

**I.    FACTUAL FINDINGS**

Federal Rule of Criminal Procedure 12(d) requires the Court to state its essential findings on the record when deciding a pretrial motion that involves factual issues. The Court finds that the testimony of Special Agent Jarrell Perry of the Drug Enforcement Administration ("DEA") and Agent Dena Willatto of the New Mexico State Police ("NMSP") was credible concerning the facts relevant to this motion. The Court also finds that the contradictory testimony given by Defendant Maria Frida Valdez-Perea was not credible. The Court makes the following additional findings of fact.

On October 23, 2011, Agent Perry and Agent Willatto were at the Greyhound bus station in

Albuquerque in plain clothes. Agent Perry has 14 years of experience with the DEA, 12 of those years in the Interdiction Unit where his daily duties include conducting drug interdiction at the various public transportation centers in Albuquerque. Agent Willatto has worked with the NMSP for eight years and is currently assigned to the Investigations Bureau in which her primary duty involves narcotics investigations, including interdiction work. She works with agents from the DEA twice during the week and every other weekend. Approximately 95% of her work with the DEA has been working with Agent Perry at the Albuquerque Greyhound bus station.

Agent Perry and Agent Willatto were at the station to check the eastbound bus from Los Angeles, California. In Agent Perry's experience, it is common to find illegal drugs on this bus route. The most common method of transport of the illegal narcotics has been concealment on the person by various methods, including in body suits or body wraps. For this particular bus route, when the bus arrives in Albuquerque, all the passengers de-board the bus while Greyhound employees wash, clean, and refuel the bus. Prior to the passengers re-boarding, it is Agent Perry's practice to be first to board the bus.

On October 23, 2011, after the eastbound bus arrived and the passengers unloaded, the agents boarded the bus. As the passengers re-boarded the bus, Agent Perry, who was at the rear of the bus, and Agent Willatto, at the front of the bus, individually spoke with the passengers. Although both Agent Perry and Agent Willatto carried a firearm and handcuffs, neither item was visible as they conversed with the passengers. Agent Perry wore an audio recording device. Agent Perry worked from the back of the bus towards the middle, while Agent Willatto worked from the front of the bus towards the middle. Agent Willatto usually sits in a seat so as not to be in the way of passengers boarding the bus.

Agent Perry approached Ms. Valdez-Perea, a petite woman, who was wearing a jacket and

blouse. He stood in the aisle behind the row of seats to which Defendant entered on the right-hand side, approximately three to four seats from the rear of the bus. Defendant sat in the window seat. There were other passengers on the bus at the time.

Agent Perry asked her in English how she was doing, identified himself as a police officer, and asked if he could speak with her, but she did not respond. Agent Perry then switched to Spanish. Agent Perry is not fluent in Spanish but speaks Spanish virtually every work day and knows enough to ask interdiction questions. In Spanish, he asked her if she spoke Spanish, which she said she did. He then proceeded to speak to her in Spanish.

Agent Perry showed her his badge and identified himself as a police officer. He asked what her destination was, and she replied, "Philadelphia." He then asked where she lived, and she said she was from Phoenix. He then said, "your ticket, please," which she gave him. He reviewed it and returned it to her. He then asked, "And your identification, please?" Defendant did not respond verbally, but handed him some identification documents. He reviewed her identification and returned it to her. Agent Perry asked for her identification documents because, in his experience, a very high percentage of the people that he has arrested have been traveling from Phoenix. He has also arrested numerous passengers traveling to Philadelphia from Phoenix. He asked to see her ticket and identification to confirm that she was traveling under her correct name because a lot of bus passengers travel under false names, as Greyhound does not ask for identification when a person purchases a ticket.

Agent Perry then asked whether Defendant had luggage or bags. She responded that they were below. He asked, "Nothing above?" and she replied, "No." Agent Perry then asked, "May I search your bag for contraband?" Defendant responded, "Yes." He thanked her, searched her purse, and, finding no contraband, returned it to her. He then asked if he could search her blanket for

contraband. Before he could finish asking the question, Defendant responded, "Yes," so he searched the blanket and returned it to her.

Then he asked, "May I search your person?" Although Defendant said nothing verbally, she nodded her head, then stood up from her window seat, moved into the aisle, and lifted her arms at a 90 degree angle from her body. Defendant faced the front of the bus while Agent Perry was behind her, so as not to block the pathway towards the door. Based on her actions, Agent Perry believed Defendant was giving him consent to search her person. Agent Perry started his pat-down search at her waist in the stomach area and then patted down her back near the waist area. He did not search Defendant's breast or groin areas. Agent Perry often conducts consensual pat-down searches of women and his practice during these searches is not to search the private areas.

Agent Perry observed that Defendant had on a tight-fitting body suit. He felt a hard bundle on Defendant's left side near her waist. Upon Agent Perry feeling the area with the bundle, Defendant immediately turned away and sat down. In Agent Perry's experience in interdiction work, it is rare for a woman to be wearing a body suit and not have contraband.

Agent Perry proceeded to speak to the other passengers who boarded the bus, asking similar questions about their destinations and whether he could search their belongings. He asked at least one other male passenger whether he could search his person. Agent Perry used a conversational, cordial tone throughout his encounters with Defendant and the other passengers. During each encounter, he asked to conduct the respective searches; he did not issue orders or commands.

After speaking to the other passengers, he met up with Agent Willatto. He told Agent Willatto about the body wrap on Defendant and asked her to pat down Defendant. Agent Willatto also believed the body suit to be significant because it could have contained narcotics.

They then approached Defendant who was seated with her eyes closed and had a blanket

over her body.  Agent Perry stood one seat in front of Defendant, but across the aisle.  Agent Willatto stood behind Defendant.  Agent Perry asked Defendant in Spanish, "Ma'am, okay, may I search your person for contraband for my friend?"  Defendant gave no audible response.  Agent Perry asked, "Yes?"  Defendant again gave no audible response.  Defendant, however, stood up, stepped into the aisle, and extended her arms up at a 90 degree angle to her body.  Agent Willatto believed that Defendant was consenting to the search.

   Agent Willatto searched Defendant on her sides.  Agent Willatto detected an object during the search.  Agent Willatto pulled Defendant's jacket and a corner of her shirt down.  She observed packaging tape.  As soon as Agent Willatto saw the packaging tape, Defendant pushed her hand away.  Agent Willatto asked Agent Perry to ask Defendant what the hard things are.  He responded, "No."  Then, believing the hard objects were consistent with others containing illegal narcotics, Agent Perry immediately arrested Defendant, placed her in handcuffs, and removed her from the bus.

   In Agent Willatto's experience, she has never seen Agent Perry conduct a search when consent had not been given.  Neither Agent Perry nor Agent Willatto displayed any weapons at any time.  Agent Perry at no time told Defendant that she could refuse consent to search.

**II.    ANALYSIS**

   "A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999) (quotation omitted).  The government bears the burden to show that the consent was voluntary.  *Id.*  Mere submission to a claim of lawful authority is insufficient to meet the government's burden. *Florida v. Royer*, 460 U.S. 491, 497 (1983).

   The central question is whether a reasonable person would believe he was free to decline the

officer's requests or otherwise terminate the encounter. *United States v. Drayton*, 536 U.S. 194, 202 (2002); *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006). "[T]he 'reasonable person' test presupposes an *innocent* person." *Florida v. Bostick*, 501 U.S. 429, 438 (1991). Whether a person consented is a factual determination based on the totality of the circumstances -- both the characteristics of the accused and the details of the interrogation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006). The particular personal traits or subjective state of mind of a suspect, however, are irrelevant to the objective "reasonable person" test, unless there is evidence that the officer knew of the particular personal traits or characteristics and they influenced his conduct. *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994). The Tenth Circuit has "reject[ed] any rule that would classify groups of travelers according to gender, race, religion, national origin, or other comparable status." *Id.* For example, age, gender, education, and intelligence may be relevant in any particular case to the extent they are objectively apparent, but they cannot form the basis for general across-the-board categorizations, such as all women are always more vulnerable to coercion. *Id.* n.7.

For consent to be valid, the Government must show: (1) the consent was unequivocal, specific, and freely and intelligently given, and (2) it was given without implied or express duress or coercion. *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007); *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997). As to the first prong, a defendant's consent must be clear, but it need not be verbal, so long as the gestures or other indications of acquiescence are "sufficiently comprehensible to a reasonable officer." *Guerrero*, 472 F.3d at 789-90.

As to the second prong, courts look to a number of non-exclusive factors: (1) the suspect's knowledge of the right to refuse consent; (2) the suspect's age, intelligence, education, and language ability; (3) the nature of the questioning and request; (4) the threatening presence of a number of

6

officers; (5) the demeanor of the officers, such as their tone of voice indicating that compliance with the request was compulsory; (6) the prolonged retention of the suspect's personal effects such as identification; (7) the absence of other members of the public; (8) the length of the interview; (9) whether the officers displayed a weapon; (10) whether the officer advised the suspect that she is free to leave; (11) whether the consent request occurs during the suspect's detention; and (12) whether the person granting consent exhibits discomfort during the search or expresses a desire to halt the search. *See Drayton*, 536 U.S. at 202-04; *Schneckloth*, 412 U.S. at 226; *Cruz-Mendez*, 467 F.3d at 1265; *Ledesma*, 447 F.3d at 1314; *United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001); *United States v. Winningham*, 140 F.3d 1328, 1332 (10th Cir. 1998). The presence of multiple officers is not dispositive. *Cruz-Mendez*, 467 F.3d at 1265. Moreover, the "Supreme Court has held that officers need not expressly inform suspects that they are free to go before requesting permission to conduct a search." *Ledesma*, 447 F.3d at 1314 (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)). Nor does an officer have to inform the citizen that she is free to disregard any further questioning for the encounter to be consensual. *See United States v. West*, 219 F.3d 1171, 1176-77 (10th Cir. 2000).

As to the first search, the Court finds that Defendant nodded assent, stepped into the aisle, and raised her arms in a way that showed unequivocal consent to the search. Similarly, when asked to consent to the second search, Defendant stepped into the aisle and raised her arms up in a way that again showed unequivocal consent to search. Defendant's testimony to the contrary was not credible on this key question. Although she admitted to stepping into the aisle, but not nodding, she said she did not remember whether she put up her arms. Her memory regarding the encounters was poor, to say the least. Agent Perry's and Agent Willatto's testimony, by contrast, was credible and consistent with one another.

Affirmatively nodding constitutes a show of consent. *See United States v. Ringold*, 335 F.3d 1168, 1175 (10th Cir. 2003). Raising arms, alone, would also indicate consent. *Cf. Drayton*, 536 U.S. at 199 (bus passenger responded to request to search by lifting his hand eight inches from his legs); *United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (holding that defendant consented to pat-down search where, in response to officer's non-threatening question whether he could pat him down, defendant responded by shrugging his shoulders and raising his arms). *See also United States v. Livingston*, 429 Fed. Appx. 751, *3 (10th Cir. July 11, 2011) (unpublished opinion) ("Before entering the bedroom, the officers asked Ms. Adams where Mr. Livingston was located. She responded 'in the closet,' pointed in that direction, and stepped out of the bedroom to let the officers in. . . . While she did not expressly tell the officers to come in, Ms. Adams's 'non-verbal conduct' in pointing to the closet and stepping out of the bedroom constituted a voluntary consent to search."). In light of all the facts, the Court concludes that Defendant gave unequivocal, specific consent to search her person before both the first and second pat-down search.

The Court also finds that Defendant understood what she was being asked. Agent Perry's Spanish was comprehensible and Defendant, through her responses and actions, demonstrated that she understood what was being asked of her as to each of Agent Perry's requests. The Court therefore concludes that Defendant's consent was freely and intelligently given.

As to the second prong of the analysis, the overwhelming majority of facts demonstrates that Defendant gave her consent without implied or express duress or coercion. Agent Perry used a conversational tone throughout the encounter that in no way indicated that compliance was required. Agent Perry asked for Defendant's consent; he did not command it. There were only two agents on the bus, the agents wore plain clothes, and neither agent displayed a weapon or physically restrained Defendant prior to her arrest. Agent Perry returned Defendant's ticket, identification documents,

8

purse, and blanket to her immediately and before requesting the pat-down search. The encounters and searches occurred in a public bus in view of other citizens. Neither agent blocked Defendant into or out of her seat. The agents also did not block Defendant's path to exit the bus. The requests to search did not occur while Defendant was detained. Agent Perry's initial conversation with Defendant lasted mere minutes, and the subsequent conversation with Agent Willatto present was even shorter. Defendant did not express discomfort during the search. Defendant did, however, feel free to end each search when each agent felt the hard object. Defendant turned around and sat down when Agent Perry felt the hard bundle and pushed Agent Willatto's hand away when she saw the packaging, indicating that she did not feel coerced to passively submit to the agents' authority.

One fact that Defendant heavily relies on is that Agent Perry did not inform her that she was free to go or to end the conversation. Although a factor, the failure to inform a suspect that she was free to leave or disregard the officer's questions, "should carry little weight" in the court's analysis. *United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008). This factor specifically carries negligible weight in this case, given that Defendant acknowledged in the hearing that she understood she could have refused Agent Perry's request to search: When asked if Agent Perry ever told her she had to submit to a search, Defendant responded, "No." Then, when asked if she could have just stopped the encounter and gone back to what she was doing, Defendant replied, "Yes." This factor thus does not shift the balance in Defendant's favor.

Defendant also urges the Court to consider the subjective factors of her gender, petite stature, her partial disability, and her foreign citizenship. As an initial matter, there is no evidence the agents knew that Defendant had a disability. Although her gender and petite stature were apparent, there is no evidence that either factor influenced the agents. For example, there is no evidence that Agent Perry loomed over her in an intimidating manner. Although Defendant's gender was the

9

reason Agent Perry had Agent Willatto perform the second pat-down search, there is no other evidence indicating that Defendant's gender influenced the agents' conduct such that the Court should consider it. A review of the audio recording shows that Agent Perry, in the same conversational tone, asked similar questions of each passenger on the bus, both men and women, about their destinations and whether he could search their belongings. He also asked a man for permission to search his person. Thus, this Court will not consider either Defendant's gender, petite stature, or her disability. *Cf. Little*, 18 F.3d at 1505 (noting that defendant's slight physique and medical condition were only relevant if officer knew of them and they influenced his conduct). As for Defendant being a non-citizen, Agent Perry likely knew this fact based on the identification documents Defendant provided. However, there is no evidence that he knew of her educational background or of any alleged unfamiliarity with her rights in the United States. Nor is there evidence that her citizenship influenced Agent Perry in any way, other than his speaking to her in Spanish. This factor thus should be afforded little to no weight in the Court's analysis. *See United States v. Zapata*, 997 F.2d 751, 759 & n.6 (10th Cir. 1993) (explaining that, while age, gender, education, and intelligence of accused may be relevant, intangible characteristics such as cultural heritage or attitude toward authority are inherently unverifiable and unquantifiable, and thus, should not be considered in consent analysis).[1]

In sum, the Court concludes that Defendant's conduct in nodding, stepping into the aisle, and raising her arms constituted an unequivocal show of assent to a pat-down search. Considering the

---

[1] The Tenth Circuit in *Zapata* expressly disagreed with the case relied on by Defendant, *United States v. Recalde*, 761 F.2d 1448 (10th Cir. 1985). *See Zapata*, 997 F.2d at n.6 ("While we would accord that factor no weight, one panel of this court cannot overrule another panel. We are quite confident, however, that *Recalde* does not require that the factor be given controlling or even significant weight, as it was in this case by the district court.") (internal citation omitted).

totality of the circumstances, the Court additionally determines that Defendant's consent was freely and intelligently given without implied or express duress or coercion. *Cf. Drayton*, 536 U.S. at 203-06 (concluding that similar circumstances did not amount to coercive encounter); *United States v. Broomfield*, 201 F.3d 1270, 1273-75 (10th Cir. 2000) (same).

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress and Memorandum in Support (**Doc. 21**) is **DENIED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE